No. 12-11211

# In the United States Court of Appeals for the Fifth Circuit

---

THE INCLUSIVE COMMUNITIES PROJECT, INCORPORATED,
*Plaintiff-Appellee*,

v.

TEXAS DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS; MICHAEL GERBER; LESLIE BINGHAM-ESCARENO; TOMAS CARDENAS; C KENT CONINE; DIONICIO VIDAL FLORES, Sonny; JUAN SANCHEZ MUNOZ; GLORIA L. RAY, In Their Official Capacities,
*Defendants-Appellants*,

FRAZIER REVITALIZATION, INCORPORATED,
*Intervenor-Appellant*.

---

On Appeal from the United States District Court
Northern District of Texas, Dallas Division

---

## BRIEF OF APPELLANTS

---

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney
    General

JONATHAN F. MITCHELL
Solicitor General

BETH KLUSMANN
Assistant Solicitor General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
[Tel.] (512) 936-1914
[Fax] (512) 474-2697

COUNSEL FOR APPELLANTS

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

## *Defendants-Appellants*

Texas Department of Housing and Community Affairs
Michael Gerber
Leslie Bingham-Escareno
Tomas Cardenas
C. Kent Conine
Dionicio Vidal Flores (Sonny)
Juan Sanchez Munoz
Gloria L. Ray

## *Defendants-Appellants to be Substituted*[1]

Timothy Irvine
J. Paul Oxer
Tom H. Gann
Lowell A. Keig
J. Mark McWatters

## *Counsel for Defendants-Appellants*

Beth Klusmann
James "Beau" Eccles
OFFICE OF THE TEXAS ATTORNEY GENERAL

---

1. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Appellants advise the Court that five of the Defendants who were sued in their official capacities are no longer serving in office. Michael Gerber has been replaced by Timothy Irvine as Executive Director of the Department. And Tomas Cardenas, C. Kent Conine, Dionicio Vidal Flores, and Gloria L. Ray have been replaced by J. Paul Oxer, Tom H. Gann, Lowell A. Keig, and J. Mark McWatters on the Board. Leslie Bingham-Escareno and Juan Sanchez Munoz continue to serve on the Board.

i

***Former Counsel for Defendants-Appellants***
G. Tomas Rhodus
William B. Chaney
David Cameron Gair
James D. MacIntyre
Michael C. Kelsheimer
LOOPER, REED & MCGRAW PC

Shelley N. Dahlberg
Timothy Earl Bray
OFFICE OF THE TEXAS ATTORNEY GENERAL

***Plaintiff-Appellee***
The Inclusive Communities Project, Inc.

***Counsel for Plaintiff-Appellee***
Michael M. Daniel
Laura Beth Beshara
DANIEL & BESHARA, PC

***Intervenor-Appellant***
Frazier Revitalization, Inc.

***Counsel for Intervenor-Appellant***
Brent M. Rosenthal
LAW OFFICE OF BRENT M. ROSENTHAL, PC

_/s/ Beth Klusmann_
Beth Klusmann
*Attorney of Record for Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

This case involves an issue of first impression in this Circuit—namely, the legal test to apply in a claim of disparate-impact discrimination under the Fair Housing Act. Oral argument would be helpful in light of the extensive record and the legal issues involved. Because Defendants are currently operating under a court-ordered remedial plan as a result of the district court's judgment, Defendants request that argument be set at the first available sitting.

# TABLE OF CONTENTS

Certificate of Interested Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  viii

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Issues Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

    I.    Legal & Factual Background . . . . . . . . . . . . . . . . . . . . . . . .  6

        A.    Overview of Tax-Credit Program . . . . . . . . . . . . . . .  6

        B.    The Qualified Allocation Plan . . . . . . . . . . . . . . . . . .  8

        C.    Application and Award Process . . . . . . . . . . . . . . . . .  12

        D.    Historical Changes to the QAP . . . . . . . . . . . . . . . . .  14

        E.    The Inclusive Communities Project, Inc. . . . . . . . . .  17

    II.    Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

        A.    Pre-Trial Proceedings . . . . . . . . . . . . . . . . . . . . . . . .  19

        B.    Trial and Post-Trial Proceedings . . . . . . . . . . . . . . . .  21

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

I.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

II.    The District Court Used the Wrong Legal Standard To
       Analyze the Disparate-Impact Claim. . . . . . . . . . . . . . . . . 25

       A.    At the Time Suit Was Filed, There Was No
             Uniform Standard for Disparate-Impact Claims
             Under the FHA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

       B.    HUD Regulations Now Require a Three-Step,
             Burden-Shifting Test . . . . . . . . . . . . . . . . . . . . . . . . 28

       C.    The District Court Erred by Using a Two-Step Test
             That Placed the Burden of Proof on Defendants  . . . 31

III.   ICP Failed To Prove a Prima Facie Case of Disparate-
       Impact Discrimination.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

       A.    A Disparate-Impact Plaintiff Must Identify the
             Neutral Rule or Practice That Causes the Disparity
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

       B.    ICP Did Not Identify a Facially Neutral Practice
             That Caused the Alleged Disparity . . . . . . . . . . . . . 38

       C.    ICP Did Not Prove That the Statistical Disparity
             Was Caused by Defendants' Conduct  . . . . . . . . . . . . 42

       D.    ICP's Statistical Evidence Does Not Support a
             Prima Facie Case of Discrimination . . . . . . . . . . . . . 45

             1.    ICP's statistics reflect a different geographic
                   area and too large a time period . . . . . . . . . . . . 46

             2.    ICP's statistics are based on erroneous
                   assumptions and ignore relevant facts . . . . . . . 47

E.   ICP's Other Evidence of Discrimination Does Not Establish a Prima Facie Case. . . . . . . . . . . . . . . . . . 50

F.   The District Court Erred by Referring to the Wrong Legal Standard for a Prima Facie Case . . . . . . . . . . 52

IV.  Defendants Met Their Burden of Establishing a Legitimate Interest in Their Method of Distributing Tax Credits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

A.   Defendants Needed to Prove Only a Legitimate and Substantial Interest . . . . . . . . . . . . . . . . . . . . . . . . . 53

B.   Defendants Proved Their Practices Were Supported by a Legitimate Governmental Interest in an Open and Objective Scoring System . . . . . . . . . . . . . . . . . 55

V.   ICP Did Not Prove That There Were Less Discriminatory Alternatives That Would Meet Defendants' Interests. . . . 57

A.   The District Court's Suggestions Open Defendants to Further Litigation and Do Not Satisfy Their Interests in Objectively Awarding Tax Credits . . . . 58

B.   The District Court's Challenges to Specific QAP Elements Were Not Made by ICP or Supported with Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

VI.  The District Court Erroneously Required Defendants To Achieve a Racially Balanced Distribution of Tax Credits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

A.   The District Court's Remedial Plan May Result in Future Litigation Under the Equal Protection Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

B.   There Is No Evidence That the Remedial Plan Will Redress ICP's Complaint . . . . . . . . . . . . . . . . . . . . . 67

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

T<small>ABLE OF</small> A<small>UTHORITIES</small>

## Cases

*Affordable Hous. Dev. Corp. v. City of Fresno*,
　433 F.3d 1182 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Arguello v. Conoco, Inc.*,
　207 F.3d 803 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Artisan/Am. Corp. v. City of Alvin*,
　588 F.3d 291 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Bennett v. Nucor, Corp.*,
　656 F.3d 802 (8th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Betsey v. Turtle Creek Assocs.*,
　736 F.2d 983 (4th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Bunch v. Bullard*,
　795 F.2d 384 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
　467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*City of New Orleans v. BellSouth Telecomms., Inc.*,
　690 F.3d 312 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Doe v. Tangipahoa Parish Sch. Bd.*,
　494 F.3d 494 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Fair Hous. in Huntington Comm., Inc. v. Town of Huntington*,
　316 F.3d 357 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*French v. Allstate Indem. Co.*,
　637 F.3d 571 (5th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Gallagher v. Magner,*
　　619 F.3d 823 (8th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 26, 34, 54

*Graoch Assocs. #33, L.P. v. Louisville / Jefferson Cnty.*
*Metro Human Relations Comm'n,*
　　508 F.3d 366 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . 26, 30, 37, 54

*Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't*
*of Hous. & Urban Dev.,*
　　639 F.3d 1078 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . 46, 62

*Griggs v. Duke Power Co.,*
　　401 U.S. 424 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Havens Realty Corp. v. Coleman,*
　　455 U.S. 363 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46-47

*Huntington Branch, NAACP v. Town of Huntington,*
　　844 F.2d 926 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . 26, 30, 32, 34

*Johnson v. Uncle Ben's, Inc.,*
　　965 F.2d 1363 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . 38, 40

*Kyles v. J.K. Guardian Sec. Servs., Inc.,*
　　222 F.3d 289 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Langlois v. Abington Hous. Auth.,*
　　207 F.3d 43 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . 26, 31, 54

*Lewis v. City of Chicago,*
　　130 S. Ct. 2191 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,*
　　558 F.2d 1283 (7th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . 27

*Mountain Side Mobile Estates P'ship v. Sec. of*
*Hous. & Urban Dev.,*
　　56 F.3d 1243 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 26

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly,*
　　658 F.3d 375 (3d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

*One Beacon Ins. Co. v. Crowley Marine Servs., Inc.,*
　　648 F.3d 258 (5th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Pacheco v. Mineta,*
　　448 F.3d 783 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 34, 52

*Reeves v. Sanderson Plumbing Prods., Inc.,*
　　530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Reinhart v. Lincoln Cnty.,*
　　482 F.3d 1225 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 54

*Resident Advisory Bd. v. Rizzo,*
　　564 F.2d 126, 149 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . 32, 54

*Ricci v. DeStefano,*
　　557 U.S. 557 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Schaffer ex rel. Schaffer v. Weast,*
　　546 U.S. 49 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Simms v. First Gibraltar Bank,*
　　83 F.3d 1546 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 28, 36

*Smith v. City of Jackson,*
　　544 U.S. 228 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35, 55

*Smith v. Town of Clarkton,*
　　682 F.2d 1055 (4th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . 27

*Tex. Dep't of Cmty. Affairs v. Burdine,*
　　450 U.S. 248 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Tsombanidis v. W. Haven Fire Dep't,*
    352 F.3d 565 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Griffin,*
    324 F.3d 330 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Walker v. City of Mesquite,*
    169 F.3d 973 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . 17, 18, 60, 67

*Wards Cove Packing Co. v. Atonio,*
    490 U.S. 642 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Watson v. Fort Worth Bank & Trust,*
    487 U.S. 977 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 64, 65

## Constitutional Provisions, Statutes and Rules

26 U.S.C. § 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 42

26 U.S.C. § 42(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

26 U.S.C. § 42(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

26 U.S.C. § 42(d)(5)(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 17, 42

26 U.S.C. § 42(d)(5)(B)(ii)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

26 U.S.C. § 42(d)(5)(B)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

26 U.S.C. § 42(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

26 U.S.C. § 42(h)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

26 U.S.C. § 42(h)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

26 U.S.C. § 42(h)(6)(B)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

26 U.S.C. § 42(m)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

26 U.S.C. § 42(m)(1)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 42, 65

26 U.S.C. § 42(m)(2)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 66

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 1982 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 19

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 19

42 U.S.C. § 2000e-2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

42 U.S.C. § 2000e-2(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 55

42 U.S.C. § 3604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19, 30

42 U.S.C. § 3605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19

42 U.S.C. § 3608(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

42 U.S.C. § 3613(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

42 U.S.C. § 3614a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

TEX. GOV'T CODE ch. 2306 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. GOV'T CODE § 2306.002(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. GOV'T CODE § 2306.111(d) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. GOV'T CODE §§ 2306.6701-.6738 . . . . . . . . . . . . . . . . . . . . . . 6

TEX. GOV'T CODE § 2306.67021 . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. GOV'T CODE § 2306.6703 . . . . . . . . . . . . . . . . . . . . . . 10, 14, 15

TEX. GOV'T CODE § 2306.6703(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

TEX. GOV'T CODE § 2306.6703(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

TEX. GOV'T CODE § 2306.6704 . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

TEX. GOV'T CODE § 2306.6705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

TEX. GOV'T CODE § 2306.6710 . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 39

TEX. GOV'T CODE § 2306.6710(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. GOV'T CODE § 2306.6710(b)(1) . . . . . . . . . . . . . . . . . . . . . . . 15, 43

TEX. GOV'T CODE § 2306.6710(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . 43

TEX. GOV'T CODE § 2306.6710(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . 43

TEX. GOV'T CODE § 2306.6710(b)(1)(E) . . . . . . . . . . . . . . . . . . . . . . . 43

TEX. GOV'T CODE § 2306.6710(b)(1)(F) . . . . . . . . . . . . . . . . . . . . . . . 43

TEX. GOV'T CODE § 2306.6710(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

TEX. GOV'T CODE § 2306.6711(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

TEX. GOV'T CODE § 2306.6714 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. GOV'T CODE § 2306.6717 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

TEX. GOV'T CODE § 2306.6718 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

TEX. GOV'T CODE § 2306.6731(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

24 C.F.R. § 100.500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

24 C.F.R. § 100.500(b)(1)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

24 C.F.R. § 100.500(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

24 C.F.R. § 100.500(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

FED. R. APP. P. 4(a)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

FED. R. APP. P. 43(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

FED. R. CIV. P. 59(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FED. R. CIV. P. 59(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## Other Authorities

Act of June 2, 2003, 78th Leg., R.S., ch. 330, §§ 18-25,
    2003 Tex. Gen. Laws 1407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Act of May 28, 2001, 77th Leg., R.S., ch. 1367, § 8.01,
    2001 Tex. Gen. Laws 3391 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fair Housing Act's Discriminatory Effects Standard,
    78 Fed. Reg. 11,460 (Feb. 15, 2013) . . . . . . . . . . . . . . . . . . . *passim*

Tex. Att'y Gen. Op. No. GA-0208 (2004) . . . . . . . . . . . . . . . . . . . . . 11, 15

No. 12-11211

# In the United States Court of Appeals for the Fifth Circuit

---

THE INCLUSIVE COMMUNITIES PROJECT, INCORPORATED,
*Plaintiff-Appellee,*

v.

TEXAS DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS; MICHAEL
GERBER; LESLIE BINGHAM-ESCARENO; TOMAS CARDENAS; C KENT
CONINE; DIONICIO VIDAL FLORES, Sonny; JUAN SANCHEZ MUNOZ; GLORIA
L. RAY, In Their Official Capacities,
*Defendants-Appellants,*

FRAZIER REVITALIZATION, INCORPORATED,
*Intervenor-Appellant.*

---

On Appeal from the United States District Court
Northern District of Texas, Dallas Division

---

This case concerns the federal Low-Income Housing Tax Credit

Program, in which private developers receive tax credits for building low-

income housing. Plaintiff the Inclusive Communities Project, Inc. asserts

that Defendants have engaged in disparate-impact discrimination by

approving too many tax-credit properties in minority neighborhoods and

not enough in Caucasian neighborhoods. The district court found

Defendants liable based on ICP's statistics, but never identified any

specific practice of Defendants that caused the alleged disparity. Defendants are now operating under a remedial plan, ordered by the district court, in an effort to encourage a different racial distribution of tax-credit units.

But the district court erred in allowing ICP to proceed beyond the prima facie stage and in placing the burden of proof on Defendants. The minimal evidence put on by ICP that is relevant to a disparate-impact claim is not enough to uphold the district court's ruling under the correct legal standard. The Court should reverse the judgment of the district court and render judgment for Defendants.

## STATEMENT OF JURISDICTION

The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and appellate jurisdiction pursuant to 28 U.S.C. § 1291. The district court entered its final judgment on August 7, 2012. USCA5 7557-85. Defendants timely filed a motion to alter or amend the judgment or, alternatively, for new trial on September 4, 2012. USCA5 7609-30; FED. R. CIV. P. 59 (a), (e). The district court granted in part and denied in part Defendants' motion and issued an amended judgment on November

8, 2012.  USCA5 7877-7908.  Defendants timely filed their notice of appeal on December 4, 2012.  USCA5 7909-11; FED. R. APP. P. 4(a)(4)(A).[2]

## ISSUES PRESENTED

(1)     Did the district court err in applying a two-step test to ICP's disparate-impact claim that placed the ultimate burden of proof on Defendants?

(2)     Did the district court err in ruling that ICP had established a prima facie case of disparate-impact discrimination when ICP failed to isolate and identify any practice of Defendants that caused the alleged impact?

(3)     Did the district court otherwise err in determining that Defendants were liable for violating the Fair Housing Act under a disparate-impact theory of discrimination?

(4)     Did the district court err in ordering Defendants to submit to a remedial plan for the next five years that seeks to encourage a racially balanced distribution of tax-credit units and may not redress ICP's claim?

## STATEMENT OF THE CASE

The Inclusive Communities Project (ICP) filed suit on March 28, 2008, claiming that Defendants' distribution of low-income housing tax credits violated 42 U.S.C. §§ 1982 and 1983, the Fourteenth Amendment,

---

2.  At the time Defendants noticed this appeal, ICP's motion for attorneys' fees was still pending in the district court.  The district court resolved that motion on February 15, 2013, USCA5 (1st Supp.) 38-53, and Defendants have appealed that order, USCA5 (2d Supp.) 39-41.  The appeal is currently docketed as *The Inclusive Communities Project v. Texas Department of Housing & Community Affairs, et al.*, Case No. 13-10306.

and the Fair Housing Act (FHA), 42 U.S.C. §§ 3604, 3605.  USCA5 37-54.

ICP joined as Defendants the Texas Department of Housing and

Community Affairs (the Department), all of the members of the Board of

Housing and Community Affairs in their official capacities, and the

Department's Executive Director in his official capacity.  USCA5 40.  ICP

alleged that the Department was perpetuating racial segregation by

disproportionately approving tax-credit units in minority-concentrated

neighborhoods, disproportionately disapproving tax-credit units in

predominantly Caucasian neighborhoods, and using race and ethnicity as

factors in making their decisions.  USCA5 41-46, 51.  ICP sought

injunctive relief that would require Defendants to approve as many tax-

credit units in non-minority census tracts as in minority census tracts.

USCA5 52-53.

  After a four-day bench trial, the district court found that ICP did not

meet its burden of establishing disparate-treatment discrimination and

therefore ordered that ICP take nothing on its claims under § 1982,

§ 1983, and the Fourteenth Amendment.  USCA5 7060-67.  However, the

district court placed the burden of proof for the disparate-impact claim on

Defendants to show, not only a sufficient government interest, but that

there were no less discriminatory alternatives that would serve Defendants' interests. USCA5 7069-70. The district court found that Defendants did not meet their burden of proving the absence of less discriminatory alternatives and, therefore, held them liable under the FHA. USCA5 7075-85.

The district court ordered Defendants to submit a proposed remedial plan that "sets out how it will bring its allocation decisions into compliance with the FHA," USCA5 7088, which Defendants did, USCA5 7109-32. Frazier Revitalization, Inc. was then granted permission to intervene to represent the interests of those who desire to revitalize low-income neighborhoods and would be harmed by ICP's goal of moving tax credits elsewhere. USCA5 7090-7108, 7337-43. The court adopted Defendants' proposed remedial plan in large part, stated that it would review the plan annually for at least five years, and entered its judgment. USCA5 7521-85. The court later issued an amended judgment to clarify several aspects of the plan and split the taxable costs between the parties. USCA5 7877-7908.

STATEMENT OF FACTS

I.    LEGAL & FACTUAL BACKGROUND

The Department, along with its Board and Executive Director, administer a variety of housing programs across Texas. TEX. GOV'T CODE ch. 2306; USCA5 6082-85. "The highest priority of the department is to provide assistance to individuals and families of low and very low income who are not assisted by private enterprise or other governmental programs so that they may obtain affordable housing or other services and programs offered by the department." TEX. GOV'T CODE § 2306.002(b). One of the ways the Department assists those individuals is through the federal Low-Income Housing Tax Credit Program. 26 U.S.C. § 42; TEX. GOV'T CODE §§ 2306.6701-.6738.

A.    Overview of Tax-Credit Program

In the Tax Reform Act of 1986, Congress authorized the States to award tax credits to developers of low-income housing. 26 U.S.C. § 42. Developers apply to build a specific project and, if awarded credits, sell the credits to investors in order to finance the project. USCA5 4738-39, 5729. To be eligible for the credits, the developer must maintain a certain number of units that are both rent-restricted and occupied by individuals

whose income is a given percentage of the area median gross income. 26 U.S.C. § 42(g)(1).[3]

Texas receives a limited amount of credits each year, which are distributed by the Department. *Id.* § 42(h)(3); USCA5 4738-39. Since the program began, the Department and its predecessor agency have approved 1898 developments, containing 211,083 units, for a total of $970,455,043 in credits. USCA5 5862-63.

The amount of credits the Board may award for a project is determined by calculating the project's "qualified basis" which is a fraction representing the percent of the project occupied by low-income residents multiplied by eligible costs. 26 U.S.C. § 42(a), (c); Defs. Ex. 223, at 2. Federal law permits a basis boost of 30% to certain projects, including those located in "qualified census tracts" (QCTs). 26 U.S.C. § 42(d)(5)(B)(i). A QCT is a census tract designated by the Secretary of Housing and Urban Development "in which 50 percent or more of the households have an income which is less than 60 percent of the area median gross income for such year or which has a poverty rate of at least

---

3. Specifically, a qualifying project must have at least 20% of its units occupied by individuals with 50% or less of the area median gross income or at least 40% of its units occupied by individuals with 60% or less of the area median gross income. 26 U.S.C. § 42(g)(1).

25 percent." *Id.* § 42(d)(5)(B)(ii)(I). The Board may allocate only the amount of credits necessary for the project to be financially feasible. *Id.* § 42(m)(2)(a).

There are two general types of credits—9% and 4%. As their name implies, the 9% credits give a developer credits based on up to 9% of a building's qualified basis. Defs.' Ex. 223, at 2. The 9% credits are distributed each July, USCA5 5877, and are oversubscribed, USCA5 5899, 7053; Pl. Ex. 1, at 46 (noting credits are oversubscribed 2.5 to 1). Thus, developers must compete with each other to earn the available credits.

Developers seeking 4% credits use private activity bonds to help finance their projects, some of which are issued by the Department, and may receive credits up to 4% of a building's qualified basis. USCA5 7057; Defs.' Ex. 223, at 2. The 4% system is non-competitive and operates year-round. USCA5 7057. Therefore, applicants need meet only certain threshold eligibility and underwriting requirements in order to receive 4% tax credits. *Id.*; TEX. GOV'T CODE § 2306.67021.

## B.    The Qualified Allocation Plan

Before a State may distribute credits under § 42, it must have a "qualified allocation plan" (QAP) that "sets forth selection criteria to be

8

used to determine housing priorities of the housing credit agency which are appropriate to local conditions." 26 U.S.C. § 42(m)(1). As stated by ICP's expert, the QAP covers "a wide range of policy priorities" and can "change over time." USCA5 667, 5583.

> Pursuant to federal law, a QAP must
>
> give[] preference in allocating housing credit dollar amounts among selected projects to—
>
> (I) projects serving the lowest income tenants,
>
> (II) projects obligated to serve qualified tenants for the longest periods, and
>
> (III) projects which are located in qualified census tracts . . . and the development of which contributes to a concerted community revitalization plan.

26 U.S.C. § 42(m)(1)(B)(ii). The QAP is essential to the 9% system, as it identifies for the Department and the developers which projects should receive credits in an open and objective manner. USCA5 5623-24, 5734; *see, e.g.*, Defs. Ex. 17 (2011 QAP). It does this by setting forth the threshold elements for projects and providing a scoring system by which projects earn points to compete against each other. Defs. Ex. 5-17 (QAPs from 1999-2011).

As a general rule, the applications that score the highest receive an award of credits. USCA5 6094, ICP Ex. 393, at 80; *see, e.g.*, Defs. Ex. 80, 84, 88, 90, 93, 101, 104, 109 (final awards and application logs for 2005-2008); *see also* Defs. Ex. 233, 235, 238, 240, 243. There are also several "set aside" categories in federal and state law that require Defendants to award credits in those categories, even if those projects do not score the highest overall. *See, e.g.*, 26 U.S.C. § 42(h)(5) (non-profit set-aside); TEX. GOV'T CODE § 2306.6714 (at-risk set-aside); USCA5 5870-71, 6261. The Texas Legislature has directed that the credits in Texas be distributed by region. TEX. GOV'T CODE § 2306.111(d). Dallas is in Region 3, so applications in that region initially compete only against each other. USCA5 5868.

A large portion of Texas's QAP is controlled by state statute. TEX. GOV'T CODE § 2306.6710; USCA5 5723. In addition to several threshold eligibility requirements, TEX. GOV'T CODE § 2306.6703, the Texas Legislature has listed ten elements that Defendants must prioritize when awarding points, *id.* § 2306.6710(b) (for example, financial feasibility, quantifiable community participation, income level of tenants, and local community support). These are often referred to as "above-the-line"

points. *See, e.g.*, USCA5 5742. The Board, through the QAP, may award "below-the-line" points for other features it values. USCA5 5721, 5820, *see, e.g.*, Defs. Ex. 14 (awarding points for serving populations with special needs or locating the project near amenities). But no below-the-line element may outweigh an above-the-line element. Tex. Att'y Gen. Op. No. GA-0208 (2004). In 2011, the QAP provided for the award of over 200 possible points. USCA5 872.

The QAP is developed annually through a collaborative process between the Department, developers, housing associations, special interest groups, and other stakeholders in the State. USCA5 6088. The process begins with working groups comprised of stakeholders and leads to a draft QAP prepared by the Department's staff. USCA5 6088-89. The draft is then discussed, potentially amended, and approved by the Board in late summer. USCA5 6089. It is published in the Texas Register for a period of notice and comment, and the Department holds a series of public hearings around the State to discuss it. *Id.* A final QAP is prepared and voted on by the Board in November. *Id.* State law requires the Governor to approve the QAP by December 1. USCA5 6089-90.

## C.    Application and Award Process

Developers submit pre-applications for 9% credits in January and February each year and include a self-score of the amount of points they believe they will receive under the QAP.[4]   USCA5 5877, 6091; TEX. GOV'T CODE § 2306.6704.  Defendants publish a list of applications and points on the Department's website so all applicants can see where they stand relative to other applicants.  USCA5 6091-92.  Some applicants decline to make full applications if their pre-application does not appear to be competitive.  *see id.*; Defs. Ex. 223, at 7 (noting that a full application can cost well over $25,000).

Final applications are due in March.   USCA5 6093.   The Department's staff reviews and underwrites the most competitive applications (i.e., those with the highest point totals) to ensure they are financially feasible and that the market will support the project.  TEX. GOV'T CODE § 2306.6710(d); USCA5 5899-5900.  There is an emphasis on financially stable projects to ensure long-term success and provision of homes for low-income residents.  USCA5 5898-99, 6248-50.  If a project fails, it is often impossible to recover and redistribute the tax credits,

---

4. Because 4% projects are awarded year-round on a non-competitive basis, they do not follow this cycle.  USCA5 7057.

leaving low-income Texans with fewer housing options.  USCA5 5899, 7066.

Prior to the July Board meeting, the Board members receive a Board Book containing all of the eligible applications and the staff's recommendations for approval.  USCA5 5874-75.  The Board hears comments and discussion at its meeting from developers, government officials, and members of the public.  USCA5 5854-55, *see, e.g.*, ICP Ex. 167, 484.  The Board then votes on which projects will receive tax credits and the amount of credits for each project.  USCA5 6094.

Until 2011, the Board also had the discretion to issue "forward commitments" to projects that may not have scored high enough to receive credits that year but were uniquely deserving of credits.  USCA5 4424-25, 6292.  A forward commitment ensured that the project would receive tax credits in the next year.  USCA5 6292.  Governor Perry, however, deleted all references to forward commitments in the 2012 QAP, so the Board is now unable to issue forward commitments.  Transcript of TDHCA Meeting at 14 (Dec. 12, 2011), *available at* http://www.tdhca.state.tx.us/board/docs/transcripts/111215-board.pdf.

### D.    Historical Changes to the QAP

Tax credits were not always distributed in line with the QAP point totals.    Prior to 2001, members of the Board exercised unchecked discretion to award credits regardless of points.  USCA5 5733, 6099-6100. This led to corruption within the Board and the indictment and conviction of a Board member for conspiracy, bribery, money laundering, and mail fraud.  *United States v. Griffin*, 324 F.3d 330 (5th Cir. 2003); USCA5 5733, 6099.  The Legislature stepped in shortly thereafter and began placing restrictions on the QAP and the Board's actions.

In 2001 and 2003, the Legislature made significant changes to the tax-credit program.  Act of June 2, 2003, 78th Leg., R.S., ch. 330, §§ 18-25, 2003 Tex. Gen. Laws 1407, 1417-22; Act of May 28, 2001, 77th Leg., R.S., ch. 1367, § 8.01, 2001 Tex. Gen. Laws 3391, 3434-49.  These changes included establishing a uniform application process and detailing the schedule and contents of the application.  TEX. GOV'T CODE §§ 2306.6704, .6705.

The Legislature also began dictating the contents of the QAP by including several threshold requirements for all applications.    *Id.* § 2306.6703.  First, the Board may not award credits to a project that is

within one linear mile of a project of the same type that was approved within the last three years (the one-mile/three-year rule). *Id.* § 2306.6703(a)(3). The Legislature also precluded the Board from awarding credits to projects in any municipality or county that had more than twice the state average of housing credits per capita without the approval of the local governing body (the two times per capita rule). *Id.* § 2306.6703(a)(4). And the Legislature prevented the Board from awarding two applications within one linear mile of each other in the same application round in any municipality of over one million people (the one-mile/one-year rule). *Id.* § 2306.6711(f) (now two linear miles).

Significantly, the Legislature created a list of nine (now ten) scoring criteria that the Department must "prioritize[] in descending order" when scoring applications. *Id.* § 2306.6710(b)(1). According to an Attorney General opinion, the Department may not alter the order of the prioritized list or give any below-the-line element more points than the lowest element on the prioritized list. Tex. Att'y Gen. Op. No. GA-0208 (2004). The Legislature forbids the Board from making an allocation that conflicts with the recommendation of the Department's staff without "good cause." TEX. GOV'T CODE § 2306.6731(a).

In addition to the legislative requirements, the Board has added elements to the QAP designed to decrease any concentration of projects and encourage development of projects in high-income areas. For example in the 2005 QAP, the Board added four points for projects located (1) in a "Recognized" or "Exemplary" school attendance zone, or (2) in a census tract with a poverty level of 10% or less. Defs. Ex. 11, 211; USCA5 5738 (presently called "high-opportunity areas"). ICP's President Elizabeth Julian praised the Department's inclusion of these points, saying it affirmatively furthered fair housing. Defs. Ex. 211.

In the 2007 QAP, the Board made the element "Developments in Census Tracts with No Other Existing Developments Supported by Tax Credits" its own separate scoring item, rather than one of several options for points, increasing its effect. Defs. Ex. 13. The Board also prevented an applicant from receiving the 30% basis boost in a QCT that had more than 40% tax-credit units per household unless it was a rehabilitation project and limited developments in areas where there were more than 30% tax-credit units per household. *Id.*

In 2008, pursuant to the Housing and Economic Recovery Act, Congress opened up the 30% basis boost to any project designated by the

State agency in charge of tax credits. 26 U.S.C. § 42(d)(5)(B)(i), (v). In response, the Department permitted the basis boost to be awarded to projects in "high opportunity areas" (HOAs), which it defined as locations within a quarter mile of bus or rail transit, in a census tract that has income levels higher than the county, in a school attendance zone that has a school with Exemplary or Recognized ratings, or in a census tract that has no greater than 10% poverty. Defs.' Ex. 15, at 6-7, 18-19; USCA5 6268-70.

### E.    The Inclusive Communities Project, Inc.

ICP was established in 2004 with a mission to "create and maintain racial and economically inclusive communities throughout the Dallas metro area, as well as create affordable and fair housing opportunities for low-income people, and to seek [redress] for segregative or discriminatory policies and practices." USCA5 5649; *see also* USCA5 48; Defs. Ex. 139. ICP manages the trust created as part of the *Walker* litigation, in which HUD and the City of Dallas were found liable for racial discrimination in public housing. Defs. Ex. 151; *Walker v. City of Mesquite*, 169 F.3d 973, 975-76 (5th Cir. 1999).

ICP assists African-American families holding section 8 vouchers in finding housing opportunities in Dallas's suburbs. USCA5 38-39, 5649. To do this, ICP provides landlord bonuses, application fees, security deposit assistance, assistance connecting new utilities, and counselors to help find housing. USCA5 5649. ICP desires to place its clients in what it terms "high-opportunity areas" which it defines as meeting the *Walker* standards[5] and having a poverty level below 10%, a median income of at least 80% of the area median income, and a school zone that is exemplary or recognized. USCA5 5653. ICP's Director of Programs and Advocacy testified that these areas are 97% Caucasian. *Id.*

Properties receiving tax credits are not permitted to discriminate against individuals with section 8 vouchers. 26 U.S.C. § 42(h)(6)(B)(iv). ICP, therefore, does not have to offer as much financial assistance when placing its clients in tax-credit properties. USCA5 4746. ICP asserts that Defendants' conduct has resulted in a concentration of tax-credit properties in high-minority neighborhoods and few properties in

---

5. A *Walker* census tract is one that "according to the most recent decennial census, (i) has a black population at or below the average black population of the City of Dallas, (ii) has no public housing, and (iii) has a poverty rate at or below the average for the City of Dallas." USCA5 7074 n.21.

Caucasian neighborhoods, thereby injuring ICP by requiring it to spend more money to meet its clients' desires to move into predominantly Caucasian neighborhoods.  USCA5 41-46.

## II.  PROCEDURAL BACKGROUND

### A.    Pre-Trial Proceedings

Dissatisfied with the racial distribution of non-elderly tax credits in the Dallas area, ICP filed suit under 42 U.S.C. §§ 1982 and 1983, the Fourteenth Amendment, and the Fair Housing Act, 42 U.S.C. §§ 3604, 3605.[6]  USCA5 37-54.   ICP alleged that Defendants engaged in discrimination by disproportionately approving tax-credit units in high-minority areas and disproportionately denying tax-credit units in low-minority areas.  USCA5 41-46.

Following discovery, ICP filed a motion for partial summary judgment to establish standing and a prima facie case of discrimination. USCA5 582-625.  To support its discrimination claim, ICP relied on statistics it had gathered showing that, between 1999 and 2008, Defendants approved 49.7% of proposed non-elderly units in 0-10%

---

6.  ICP did not consider the location of tax-credit units for projects intended to house the elderly because the population of such projects is predominantly Caucasian, and therefore not helpful to ICP's goal of racial integration of families.  USCA5 45, 2666.

Caucasian census tracts, but only 37.4% of proposed non-elderly units in 90-100% Caucasian census tracts.  USCA5 1333-34, 1348.  Defendants filed motions for judgment on the pleadings and summary judgment. USCA5 2447-83.  In their briefing, Defendants argued that, assuming for purposes of summary judgment that ICP had met its prima facie case, Defendants won on the subsequent stages of the analysis—under both a disparate-treatment and disparate-impact theory of discrimination. USCA5 2452-76.  ICP responded to the disparate-treatment claim, but explicitly stated that it had not pleaded a disparate-impact claim.  USCA5 3085 n.8.

Regardless, on the basis of ICP's statistics, the district court held that ICP had established standing and a prima facie case of both disparate-treatment and disparate-impact discrimination.  USCA5 4736-72.  In addition to ICP's statistics on the approval of units per racial decile, the court also noted a study by HUD that found that 69% of all tax-credit units in Dallas were in 50% or greater minority areas, compared to 45% of units overall.  USCA5 4755-56.  The district court did not identify what practice Defendants used that caused the disparate impact, but placed the burden of proof and persuasion on Defendants to prove a

compelling governmental interest and the absence of less discriminatory alternatives.  USCA5 4763.

## B.    Trial and Post-Trial Proceedings

A bench trial was held over four days, and the parties submitted post-trial briefing in lieu of closing arguments.  Because ICP focused its arguments on Defendants' approval of units, Defendants put on evidence at trial explaining why an objective and transparent scoring system was necessary and why the use of discretion to trump the scoring system was harmful to the process.    USCA5 5698, 5734, 5898-99, 6100, 6183. Defendants also presented evidence that, had ICP focused on the approval of *projects* (as opposed to *units* within the projects), the statistical difference between the 0-10% and 90-100% Caucasian deciles would have been nonexistent.  USCA5 5971-72 (noting the approval rates were 50.5% and 51%, respectively).  The evidence further showed that Defendants approve projects, not individual units.  USCA5 6247.

In a memorandum opinion, the district court found that ICP had not met its burden of proving that Defendants were intentionally discriminating on the basis of race (disparate treatment).  USCA5 7060-67.  As for the disparate-impact claim, the district court concluded that

"Defendants have . . . failed to prove by a preponderance of the evidence that allocating tax credits in a nondiscriminatory and nonsegregative manner would impair any of the asserted interests." USCA5 7076.

The district court found that Defendants did not prove that they could not do more with the below-the-line points, USCA5 7077, and suggested some changes to the QAP to try and de-emphasize low-income locations, concluding that these were more likely to have high concentrations of minorities, USCA5 7078-82. The court did not, however, cite any evidence that showed its suggestions would have altered the racial distribution of tax-credit units.  The court also posited that Defendants might have been able to use forward commitments differently, but that it "remains unclear" whether any changes would have reduced the disparity.  USCA5 7082-83.  With respect to 4% credits, the court stated "the question remains" whether Defendants could have used their discretion to achieve a different racial result.  USCA5 7083-85.

The district court ordered Defendants to propose a remedial plan that would set out how it intended to bring its allocation decisions into compliance with the FHA.  USCA5 7088.  Because ICP's case focused solely on a statistical disparity, Defendants proposed a plan designed to

encourage a different racial distribution of tax-credit properties using race-neutral methods. USCA5 7109-32. Frazier also intervened to protect its interest in developing projects in low-income (and likely high-minority) areas. USCA5 7090-7108, 7337-43. The district court adopted Defendants' proposed plan in large part and applied it only to a five-county area that included Dallas. USCA5 7521-56. The court accepted Defendants' proposal to provide more points to projects in HOAs, but rejected Defendants' attempt to provide similar points to projects in QCTs, concluding that the federal preference for QCTs engaged in community revitalization should not be met with the award of additional points. USCA5 7540-41, 7544-45. The court stated it would review the plan and Defendants' actions every year for a minimum of five years. USCA5 7560.

## SUMMARY OF ARGUMENT

The Supreme Court has warned against expanding the disparate-impact cause of action, suggesting that it could lead to the implementation of quotas or equal-protection violations. Those concerns are present in this case. Because the district court did not hold ICP to its burden of identifying the practice used by Defendants that caused the alleged racial disparity and placed the ultimate burden on Defendants, Defendants were

effectively found liable for not maintaining a racial balance of tax-credit units. The court-ordered remedy further exacerbates the problem by requiring Defendants to consciously pursue and achieve a satisfactory racial mix of tax-credit units. This Court should make clear that disparate-impact plaintiffs must meet their burdens—both at the prima facie stage and the less-discriminatory-alternative step of the analysis. The judgment against Defendants should be reversed and rendered in their favor.

**ARGUMENT**

## I.  STANDARD OF REVIEW

When an appeal is taken following a bench trial, the Court reviews the district court's findings of fact for clear error and its conclusions of law de novo. *City of New Orleans v. BellSouth Telecomms., Inc.*, 690 F.3d 312, 322 (5th Cir. 2012). "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011) (internal quotation marks omitted).

## II.    THE DISTRICT COURT USED THE WRONG LEGAL STANDARD TO ANALYZE THE DISPARATE-IMPACT CLAIM.

Disparate-impact discrimination, which is at issue in this appeal, occurs when a defendant uses "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). This is distinguished from disparate-treatment discrimination, which involves intentional discrimination on the basis of a protected characteristic. *Id.*

At the time ICP filed its lawsuit, the courts of appeals had not settled upon a single legal test to apply to disparate-impact claims under the FHA. The Supreme Court had yet to weigh in on the issue, and this Court's analysis had not moved beyond the prima facie stage. In its post-trial briefing, Defendants urged the district court to apply a three-step, burden-shifting test in which the ultimate burden was on ICP. USCA5 6538-39. The district court, however, used a two-step test that placed the burden of proof on Defendants. USCA5 7068-70.

After the district court rendered judgment, the Department of Housing and Urban Development issued regulations establishing a three-step, burden-shifting test for disparate-impact claims under the FHA. Implementation of the Fair Housing Act's Discriminatory Effects Standard,

78 Fed. Reg. 11,460, 11,482 (Feb. 15, 2013) (to be codified at 24 C.F.R. § 100.500). This Court should apply that test in this case. *See id.* at 11,474 (stating that new rule "will apply to pending and future cases").

### A. At the Time Suit Was Filed, There Was No Uniform Standard for Disparate-Impact Claims Under the FHA.

When ICP filed its lawsuit, there were almost as many disparate-impact tests as there were courts of appeals. Some courts used a two-step test that required the plaintiff to prove a prima facie case and then placed the burden on the defendant to prove up a legitimate governmental interest and the absence of less discriminatory alternatives.[7] Others used some variation on a three-step test, following the pattern of the two-step test but shifting the burden back to the plaintiff at some point.[8] And still

---

7. *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 936 (2d Cir. 1988); *see also Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 51 (1st Cir. 2000) (requiring only a "legitimate and substantial goal").

8. *Gallagher v. Magner*, 619 F.3d 823, 833-34 (8th Cir. 2010); *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 374 (6th Cir. 2007); *Mountain Side Mobile Estates P'ship v. Sec. of Hous. & Urban Dev.*, 56 F.3d 1243, 1254 (10th Cir. 1995); *see also Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011) (requiring defendant to prove there is no less discriminatory alternative and plaintiff to prove there is a less discriminatory alternative).

others used a four-part balancing test, in which the court weighs four factors to decide whether the law was violated.[9]

The Supreme Court was poised to rule on this issue, having granted certiorari in *Magner v. Gallagher*, No. 10-1032, but the parties dismissed the case by agreement shortly before oral argument.  The Supreme Court is again considering the issue in *Township of Mount Holly v. Mt. Holly Gardens Citizens in Action, Inc.*, No. 11-1507, and has called for the view of the Solicitor General.  But as of the time of filing this brief, a decision on certiorari had not been made.

This Court has had only a few occasions to consider disparate-impact claims under the FHA.  In each case, though, the evidence was so lacking that the Court never made it past the initial analysis.  *See, e.g., Artisan/Am. Corp. v. City of Alvin*, 588 F.3d 291, 298-99 (5th Cir. 2009) (affirming the dismissal of a disparate-impact claim regarding the denial of a permit to build low-income apartments and noting there was no analysis of the racial make-up of prospective tenants, no evidence of a waiting list for affordable housing, and numerous other locations on which

---

9. *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); *cf. Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 988 n.5 (4th Cir. 1984) (using a two-step test for private defendants).

the housing could be located); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555-56 (5th Cir. 1996) (holding that the plaintiff failed to identify a discriminatory policy, much less produce evidence that the policy had a disparate impact on minorities).

## B.  HUD Regulations Now Require a Three-Step, Burden-Shifting Test.

In February of this year, HUD adopted regulations designed to end the confusion among the courts by providing the legal standard for disparate-impact claims under the FHA.  Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. at 11,482. The regulations require a three-step, burden-shifting analysis that puts the final burden of proof on the plaintiff:

(c) Burdens of proof in discriminatory effects cases.

(1) The charging party . . . has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect.

(2) Once the charging party or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.

(3) If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the charging

party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.

24 C.F.R. § 100.500.

Congress has given HUD authority to issue regulations interpreting the FHA. 42 U.S.C. §§ 3608(a), 3614a. Because HUD's regulations were subject to notice and comment, they deserve deference unless Congress has clearly spoken on the issue or the regulations are not based on a permissible construction of the statute. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844-45 (1984).

As evidenced by the range of courts of appeals decisions, Congress has not spoken clearly on the burden-of-proof issue in disparate-impact claims under the FHA. *See supra*, Section II.A. HUD's regulations are a reasonable interpretation of the burden of proof and should be applied in this case.[10]

_____

10. In the pending *Mount Holly* petition, the Supreme Court is considering the predicate question of whether the FHA permits a cause of action for disparate-impact discrimination in the first place. *Twp. of Mount Holly v. Mt. Holly Gardens Citizens in Action, Inc.*, No. 11-1507. In the event the Supreme Court grants certiorari and rules that such a cause of action is not available, Defendants ask the Court to reverse and render judgment in their favor. However, because this Court has already concluded that a disparate-impact claim may be brought under the FHA, Defendants will focus their briefing on the legal standard for judging such claims. *See French v. Allstate Indem. Co.*, 637 F.3d 571, 589 (5th Cir. 2011) (panels of the Court are bound by prior decisions absent an intervening Supreme Court decision or en banc vote).

To begin, the three-step test mirrors Supreme Court precedent concerning disparate-impact claims in employment litigation under Title VII. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656-61 (1989); *see also* 42 U.S.C. § 2000e-2(k). Title VII and the FHA are similarly worded in their prohibition of discrimination, 42 U.S.C. §§ 2000e-2(a), 3604 (prohibiting discrimination "because of" protected trait), and many courts interpreting the FHA have borrowed from Title VII precedent, *Graoch Assocs.*, 508 F.3d at 371-73; *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 295 (7th Cir. 2000); *Huntington Branch*, 844 F.2d at 934-35. It makes sense to continue to interpret the two statutory schemes similarly.

As recognized by HUD, the three-step test also has the benefit of not requiring either party to "prove a negative." Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. at 11,474. That advantage is clearly seen in this case, in which the district court determined that Defendants failed to prove a negative—that there were no less discriminatory alternatives. USCA5 7075-85. Several of the "alternatives" identified by the district court were not presented or argued by ICP, but instead were raised for the first time when the court ruled against Defendants. USCA5 7080-82. Had the burden remained on ICP,

Defendants would have known which of any number of possible arguments they would need to counter. Placing the final burden on the plaintiff is also in line with Supreme Court precedent, which has emphasized keeping the ultimate burden on the plaintiff in discrimination cases. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Wards Cove*, 490 U.S. at 659.

The burden-shifting test also helps the parties and the courts by providing objective factors with set burdens of proof, unlike the four-factor balancing test used by some courts. As stated by the First Circuit, "we do not think that the courts' job is to 'balance' objectives, with individual judges deciding which seem to them more worthy." *Langlois*, 207 F.3d at 51. Under HUD's test, the steps and burdens are clear, and the parties know what to expect. The Court should apply the three-step test to ICP's claims in this case.

## C. The District Court Erred by Using a Two-Step Test That Placed the Burden of Proof on Defendants.

The district court did not use a three-step test, instead originally requiring Defendants to (1) justify their actions with a compelling governmental interest and (2) prove that there were no less discriminatory

31

alternatives.   USCA5 4763-64.   In response to Defendants' post-trial briefing, the court considered a standard lower than "compelling," USCA5 7069-70 n.17, but ultimately concluded that Defendants failed to prove there were no less discriminatory alternatives, USCA5 7075-85. Defendants never should have had to bear that burden in the first place.

As support for its legal test, the district court relied on the Second Circuit's opinion in *Huntington Branch*.  USCA5 7068-70.  But *Huntington Branch*, and the cases on which it relies, predate the Supreme Court's opinion in *Wards Cove*, which identified all three steps for proving a disparate-impact claim (albeit in the employment context).  *Huntington Branch*, 844 F.2d at 939 (citing *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 149 (3d Cir. 1977)).  Instead, those cases cite *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), which described the first two steps of the disparate-impact analysis under Title VII but went no further because the employer could not meet the second step, *id.* at 432.  The Supreme Court has now fully explained the process for proving a disparate-impact claim. *Wards Cove*, 490 U.S. at 656-61.  This Court should follow that analysis and reject the earlier courts of appeals decisions.

Although applying the wrong legal standard alone calls for reversal, the Court should not simply reverse and remand for application of the correct standard.   As explained in the next section, ICP failed to demonstrate even a prima facie case of disparate-impact discrimination. Consequently, the Court should reverse and render judgment for Defendants.

## III.   ICP FAILED TO PROVE A PRIMA FACIE CASE OF DISPARATE-IMPACT DISCRIMINATION.

Although the district court certainly erred in articulating and applying the burden of proof, this Court need not reach that issue because ICP failed to establish a prima facie case of disparate-impact discrimination.  Supreme Court precedent requires a plaintiff not only to demonstrate a statistical disparity, but also to isolate and identify the facially neutral rule or practice that causes the disparity.

But ICP's entire case rested solely on a statistical disparity—the approval of units in minority-concentrated census tracts at a higher rate than in Caucasian census tracts.  ICP never identified a neutral rule or practice used by Defendants that caused the disparity, leaving Defendants to try and justify everything they had ever done at the second step in the analysis.  ICP's failure to identify a neutral rule is fatal to its claim.  *See*

33

*Pacheco v. Mineta*, 448 F.3d 783, 792 (5th Cir. 2006) ("A neutral employment policy is the cornerstone of any EEO disparate-impact investigation, since the EEO must evaluate both the policy's effects on protected classes and any business justifications for the policy.").

### A.    A Disparate-Impact Plaintiff Must Identify the Neutral Rule or Practice That Causes the Disparity.

Although the law regarding disparate-impact claims under the FHA has not been uniform, the precedent regarding the prima facie case has been consistent.  A prima facie case of disparate-impact discrimination requires a plaintiff to demonstrate that a facially neutral rule or practice causes or predictably results in a disparate impact on a protected class. *Wards Cove*, 490 U.S. at 657; *Gallagher*, 619 F.3d at 833; *Huntington Branch*, 844 F.2d at 934; *see also Pacheco*, 448 F.3d at 791.  The identification of the specific practice that causes the impact is key, as it frames the rest of the disparate-impact analysis and prevents defendants from being liable for any number of innocent causes of the disparity. *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (noting the "failure to identify the specific practice being challenged is the sort of omission that could result in employers being potentially liable for the myriad of innocent

causes that may lead to statistical imbalances" (quoting *Wards Cove*, 490 U.S. at 657) (internal quotation marks omitted)).

Disparate-impact law is most developed in the employment-discrimination setting. There, the Supreme Court has held that a prima facie case of disparate-impact discrimination requires the plaintiff to "isolat[e] and identif[y] the specific employment practices that are allegedly responsible for any observed statistical disparities." *Wards Cove*, 490 U.S. at 656 (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988) (plurality op.)) (internal quotation marks omitted). As the Court confirmed in 2005, "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Smith*, 544 U.S. at 241 (noting that the plaintiffs did not identify "any specific test, requirement, or practice within the pay plan that has an adverse impact on older workers").

This Court has also emphasized the importance of identifying a facially neutral policy and making the causal connection to the alleged impact. In a case brought under the Fair Housing Act, the Court framed the question as "whether a policy, procedure, or practice *specifically identified by the plaintiff* has a significantly greater discriminatory impact

on members of a protected class." *Simms*, 83 F.3d at 1555 (emphasis added); *see also Bunch v. Bullard*, 795 F.2d 384, 392 (5th Cir. 1986) ("A prima facie case [of disparate impact under Title VII] is shown by identification of a neutral employment practice coupled with proof of its discriminatory impact on the employee's work force." (internal quotation marks omitted)).

In *Simms*, the Court overturned a jury's verdict in favor of the plaintiff because the plaintiff did not "identify an alleged discriminatory policy, procedure, or practice of First Gibraltar, much less provide evidence, statistical or otherwise, that such policy, procedure, or practice had a significantly greater impact on members of a protected class." *Simms*, 83 F.3d at 1555-56. Similarly, in *Arguello v. Conoco, Inc.*, the Court rejected the disparate-impact claim of a Title II plaintiff who alleged there was a "policy," but failed to provide any evidence other than a handful of unrelated incidents. 207 F.3d 803, 813 (5th Cir. 2000); *see also id.* at 813 n.12 ("In disparate impact claims the plaintiff must first establish that there is a neutral policy or practice that has had a discriminatory impact on a particular group.").

Other courts of appeals have also noted the need for the plaintiff to identify a specific policy and demonstrate causation when bringing a disparate-impact claim under the FHA. *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003) ("Furthermore, the plaintiff must show a causal connection between the facially neutral policy and the alleged discriminatory effect."); *Graoch Assocs.*, 508 F.3d at 374 ("First, a plaintiff must make a prima facie case of discrimination by identifying and challenging a specific [housing] practice, and then show[ing] an adverse effect by offering statistical evidence of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question." (alterations in original, internal quotation marks omitted)).

This formulation of the prima facie case is used by HUD, who requires that the charging party prove that "a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c). The only potential leeway is found in HUD's response to public comment, Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,469, in which HUD suggested the specificity requirement might be relaxed if the plaintiff proved that the elements of the decision-

making process were not capable of separation for analysis—something ICP did not do and the district court did not find.[11]

## B.   ICP Did Not Identify a Facially Neutral Practice That Caused the Alleged Disparity.

ICP has never identified a facially neutral rule or practice that is used by Defendants and causes a disparate impact in the distribution of tax-credit units.  Instead, it repeatedly states that the practice Defendants must justify is the "disproportionate approval" of units in minority-concentrated areas.  USCA5 6629-31.  Even the district court articulated the "practice" as the disproportionate approval of tax-credit units in minority neighborhoods.  USCA5 7086.

But the disparate-impact analysis does not require Defendants to justify the *statistics*—it requires Defendants to justify the *practice* that leads to the statistics.  Because ICP has never identified such a practice, ICP has failed to establish a prima facie case.  *See Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1367 (5th Cir. 1992). ("Statistical disparities between the relevant labor pool and UBI's workforce are not sufficient.  A plaintiff must offer evidence isolating and identifying the specific employment

---

11. In fact, by identifying specific elements of the QAP that it believed could be less discriminatory, the district court clearly believed the elements could be separated for analysis.  USCA5 7078-80.

practices that are allegedly responsible for any observed statistical disparities." (citation and internal quotation marks omitted)).

Under the proper standard, ICP's accusation that the "practice" is the "disproportionate approval" is not sufficient.  To begin, if the alleged disproportionate approval were intentional, i.e., Defendants were deliberately considering race when making their decisions, then ICP's claim would be for disparate treatment, not for disparate impact.  The district court, however, found that ICP had not met its burden of proving intentional discrimination.  USCA5 7067.  Thus, ICP cannot argue that the challenged practice is the deliberate consideration of race.

That leaves unintentional discrimination that results in disproportionate approval.  The record in this case shows very clearly how Defendants decide which applications should receive credits: the applications that score the most points under the QAP receive the awards. *See* TEX. GOV'T CODE § 2306.6710 (requiring the Department to rank applications in accordance with state law and underwrite the highest scoring applications); USCA5 6094, ICP Ex. 393, at 80.

Since the Legislature began mandating certain scoring elements, the evidence shows that the applications that received tax credits were those

that scored the highest.[12]  For example, Defendants Exhibit 104 lists all of the pending applications in the 2007 cycle, and Defendants Exhibit 101 lists the final allocation of tax credits.  A comparison of the two in Region 3 shows that the applications with the highest point totals (broken down into urban and rural categories) were awarded credits.

The QAP, on which the scores are based, is made up of federal- and state-law requirements, as well as objective scoring factors adopted by the Board.  ICP repeatedly denied, however, that it was challenging federal law, state law, or the QAP scoring system.  USCA5 3089, 5691-92, 6633, 6722.  Nor did ICP put on evidence that the alteration of any element within the QAP would have resulted in a different racial distribution of tax-credit units.  *See Uncle Ben's, Inc.*, 965 F.2d at 1367 ("Absent 'a systematic analysis of the racial effects of all promotional criteria for each rank.  Johnson cannot establish a prima facie case of disparate impact." (citation omitted)).  Moreover the QAP is different every year.  ICP has not identified a common thread that would explain the consistent anomaly. The failure to challenge Defendants' actual practices results in the lack of a prima facie case.

---

12. *See, e.g.*, Defs. Ex. 80, 84, 88, 93, 101, 104, 109 (final awards and application logs for 2005-2008).

There are only a handful of exceptions in the Dallas metropolitan area to the general rule that the highest scoring applications receive credits. Each was supported by a different, nondiscriminatory reason. For example, Fairway Crossing, which scored high enough to earn credits, was denied credits and given only a forward commitment because the developer was soon to be indicted. USCA5 6170-71, 6193-95 (noting the Board did not want to harm the potential residents and was able to approve the project when another developer took over). Another application, Chaparral Townhomes, was denied credits in 2000 because the developer was a former Board member who had received awards in the past four years and the Board wanted to avoid the appearance of impropriety. USCA5 6189-91, 7063 n.11. City Walk at Akard was given a forward commitment because of the strong community support and additional funding it had obtained. USCA5 4425. ICP has not identified any rule or practice that would link these individual events into a disparate-impact claim, nor did ICP demonstrate that changing these awards would have significantly altered the racial distribution of units.

ICP is, therefore, left with its asserted statistical disparity and no explanation for its cause. It has failed to meet its burden of identifying a rule or practice of Defendants that caused the alleged disparate impact.

## C.    ICP Did Not Prove That the Statistical Disparity Was Caused by Defendants' Conduct.

ICP would have the Court simply assume that the racial disparity is Defendants' fault. But in this case, such an assumption is unwarranted because there are many factors that influence the distribution of tax-credit units that are outside of Defendants' control.

First, as explained earlier, federal law controls, in part, what Defendants can do within the LIHTC program. Federal law requires that the QAP show a preference for applications that are located in QCTs that are engaged in community revitalization. 26 U.S.C. § 42(m)(1)(B)(ii). And § 42 permits a "basis boost" to applications in QCTs that enables them to receive up to 30% more tax credits. *Id.* § 42(d)(5)(B)(i).

Defendants put on evidence of an association between race and income, USCA5 5967-71 (noting that minorities are over-represented in low-income groups), and ICP recognized the "admitted association," USCA5 6715; *see also* ICP Ex. 1, at 13 (noting that QCTs tend to be low-income and high-minority regions). Thus, any emphasis on placing projects in

QCTs, which are, by definition, low-income areas, could contribute to a disparate impact. But any impact that results from the federal law favoring QCTs is not caused by Defendants' actions, and they cannot be forced to shoulder the blame.

The Texas Legislature has also placed numerous requirements on the tax-credit process, none of which were challenged by ICP. To begin with, the Legislature has required Defendants to prioritize the ten above-the-line items over all other factors. TEX. GOV'T CODE § 2306.6710(b)(1). The first element is the financial feasibility of the project. *Id.* § 2306.6710(b)(1)(A). Although there are many factors that go into that determination, there was evidence that high land costs can impact the economic feasibility of a project. ICP Ex. 393, at 75. If land costs differ by neighborhood, developers may choose the lower-cost areas to propose tax-credit projects. Defendants have no control over such developer choices or the cost of available land in Dallas.

There are also required QAP elements that give points for community support or local government assistance. TEX. GOV'T CODE § 2306.6710(b)(1)(B), (E), (F). Defendants must award points for those elements, but they cannot control whether those third parties will act in

support of the developer's application.   Again, if any of those elements would result in a disparate impact, ICP has chosen not to challenge them.

ICP also repeatedly stated that it was not challenging the QAP or the 9% scoring system.  USCA5 5692, 6633.  The only complaint it raised in its post-trial briefing was that in 2006 the Board removed "laws relating to fair housing including affirmatively furthering fair housing" as a non-scoring element that it could consider when awarding tax credits.  USCA5 6371-74, 6667; ICP Ex. 521.  But ICP did not link any statistical disparity to the removal of that factor.

Besides the various laws that bind Defendants, they are also limited by the actions of multiple third parties.  *See, e.g.*, USCA5 5703-05.  The developers certainly play a large role, as they are the ones who choose the location of their projects.   Local government entities also impact the decision through their zoning laws and the requirement of city approval for some of the QAP elements.  ICP Ex. 1, at 7-15, ICP Ex. 383, at 94-96.

Finally, ICP's analysis ignores the different process for awarding 4% credits.  The 4% credits are non-competitive, and ultimately approved by the Bond Review Board.  USCA5 7057.  So as long as they meet the

threshold requirements and are financially feasible, the projects are approved. *Id.*

In sum, there are many potential reasons for the alleged disparity that either have nothing to do with Defendants' conduct or were simply not challenged by ICP. Therefore, ICP must do more than point to the disparity and claim that it is Defendants' fault. ICP must affirmatively link it to a rule or practice used by Defendants.

## D. ICP's Statistical Evidence Does Not Support a Prima Facie Case of Discrimination.

Although ICP's prima facie case fails for the reasons described above, the statistics it used to prove its case are likewise flawed, as was shown at trial. ICP primarily relied on statistics they had compiled, which were reviewed by ICP's expert Dr. Lyke Thompson. The statistics considered the approval of tax-credit units in the City of Dallas and the State by racial decile (white v. minority). ICP Ex. 9-21. Although suggesting a disparity, the statistics do not prove nearly as much as ICP asserts, and the district court should not have relied on them.

### 1.   ICP's statistics reflect a different geographic area and too large a time period.

Beginning with the geographic limitations of ICP's statistics, ICP sought relief for violations occurring in a five-county area, USCA5 7350, but it presented statistical evidence from the City of Dallas and the State, ICP Ex. 9-21.  To the extent the racial makeup of the five-county area is different from that of Dallas or Texas, ICP's statistics are unhelpful in determining whether a disparate impact exists in the geographic area that was the subject of the suit.  Indeed, under precedent from the DC Circuit, ICP's local statistics are insufficient to challenge a statewide process. *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1086 (D.C. Cir. 2011).  ICP simply does not give the Court the whole picture.

The time frame of ICP's statistics is also faulty.  ICP's statistics cover the years of 1988-2007 and 1999-2008, ICP Ex. 9-21, but the statute of limitations for FHA claims is only two years, 42 U.S.C. § 3613(a)(1).  The district court ruled that Defendants' conduct constituted a continuing violation that permitted the court to reach past two years.  USCA5 7086.  But the court failed to identify what common practice Defendants used that would result in a continuing violation.  *Id.* (citing  *Havens Realty*

46

*Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982), and noting that the limitations period runs from the "last asserted occurrence of that practice" (emphasis omitted)).  This is especially problematic because each year there were different applications, different Board members, and a different QAP.

The Supreme Court in *Lewis v. City of Chicago*, 130 S. Ct. 2191, 2199 (2010), made clear that in a claim of disparate impact, the practice itself must be "used" within the limitations period.  In that case, a firefighting test that resulted in a disparate impact occurred outside the limitations period, but the City continued to rely on the results of the test within the limitations period.  *Id.* at 2195-96.  ICP has made no such showing here.  Therefore, its statistical analysis from 1988 forward includes eighteen years of statistics that should not be considered in this case.

### 2.    ICP's statistics are based on erroneous assumptions and ignore relevant facts.

As explained by Defendants' expert, ICP's statistics do not prove what ICP claims.  The evidence is uncontradicted that Defendants approve projects—not each individual unit within the project.  USCA5 6247.  But ICP's statistics focus on the "approval" of "units," treating each unit as if Defendants conducted a separate vote on it.  ICP Ex. 9-13.  This overstates

the impact of Defendants' decisions.  Using the analogy of Defendants' expert, it is far less significant if a single dollar coin is flipped and lands on heads (project-based analysis) than if one hundred pennies are flipped and all land on heads (unit-based analysis).   Defs. Ex. 225, at 7.

When Defendants' approval of *projects* is considered, there is a 51% approval rate for projects in Dallas located in 90-100% Caucasian census tracts, and there is a 50.5% approval rate for projects located in 0-10% Caucasian census tracts.  USCA5 5971-72.  These statistics could not have supported a disparate-impact claim.   ICP brought suit based on Defendants' decision-making process.  Its statistics should focus on the subject of Defendants' actual decisions—projects.[13]

Second, not all applications are created equal, but ICP's statistics assume each application had an equal chance of success.   In the employment context, the courts have been clear that the comparison should be between similarly qualified individuals.  *See Bennett v. Nucor, Corp.*, 656 F.3d 802, 818 (8th Cir. 2011).  But ICP offered no evidence that

---

13.  Regardless, it is unclear why Defendants should be required to balance the 0-10% and 90-100% Caucasian deciles.  Consideration of non-elderly units in 0-49.9% and 50-100% Caucasian census tracts leads to approval rates of 46.9% and 36.8%, respectively.  ICP Ex. 21.  Given the federal preference for projects in QCTs, this result is hardly suggestive of discriminatory conduct.

the applications that were rejected were similar to the ones that were accepted. Indeed, the evidence is to the contrary, as the accepted applications achieved greater QAP scores than those that were rejected. *See supra*, at 10. Moreover, some of the specific applications about which ICP complains could not have been granted, as the developer failed to make a full application. USCA5 5878-80. Defendants cannot be faulted for failing to grant such applications when they were legally prohibited from doing so. Yet ICP's statistics assume all applications had an equal chance of approval.

And third, ICP's statistics do not consider the association between race and income. USCA5 5967-71, 6715. The existence of such an association means that the disparity ICP challenges could just as well be the result of measures that focus on income, rather than on race. ICP's statistics, therefore, do not demonstrate a decision-making process that could be based only on race. Instead, the statistics provide an incomplete and misleading picture of Defendants' activities.

### E. ICP's Other Evidence of Discrimination Does Not Establish a Prima Facie Case.

ICP emphasizes two other pieces of evidence—the Talton Report and comments from former Board member Shad Bogany. USCA5 37-38, ICP Ex. 1, 144. Neither establishes a prima facie case of disparate-impact discrimination.

The Talton Report was the product of a legislative committee chaired by Representative Robert Talton. Pl. Ex. 1 (the Talton Report). In 2006, the committee produced an Interim Report for the Legislature on the Department and its activities. *Id.* The committee made multiple findings across a broad spectrum of the Department's functions, one of which was that a majority of tax credits had been placed in impacted (above-average minority and below-average income) areas. *Id.* at 48. In proposing a solution, the committee recommended that stakeholders work with the Legislature to change the law because "[t]he Department's QAP provisions are dictated by state legislation; therefore, the TDHCA . . . ha[s] little authority to change statutory specifications." *Id.* at 49.

The committee also recommended that the Department add points for projects located outside impacted areas and reduce the number of notices required to potential project sites to avoid "not-in-my-backyard" protests.

*Id.* The committee commended the Department for already taking steps to deconcentrate low-income housing by providing extra points for projects outside of impacted areas. *Id.* at 51.

Like ICP's prima facie case, the Talton Report simply lists some statistics without identifying what actions of Defendants were causing the disparity. Therefore, it cannot establish a prima facie case of disparate-impact discrimination. Moreover, the 2007 and 2008 QAPs contained multiple provisions to deconcentrate tax-credit projects, as described earlier. *See supra*, at 16-17. As for reducing the number of notices, many are required by state law, TEX. GOV'T CODE §§ 2306.6717, .6718, so there is little Defendants can do. But Defendants do authorize giving notice to advocacy organizations, civil rights organizations, and social service agencies. Defs. Ex. 14.

In the early 2000s, then-Board member Shad Bogany expressed concern that tax-credit projects in the Houston area had been clustered in low-income, high-minority areas. ICP Ex. 144, at 51. In subsequent years, again as detailed earlier, the Board and the Legislature took steps making it more difficult to concentrate projects in one area. *See supra*, at 14-17; USCA5 6102-06. Moreover, ICP's evidence shows that Bogany has

asserted that ICP's lawsuit misconstrues his comments. USCA5 7296. He stated that the local communities are mostly to blame for the disparity and that the Department does not have control over where tax-credit developments are placed. *Id.* Thus, neither of these pieces of evidence demonstrate a facially neutral practice used by Defendants that caused the statistical disparity, and ICP still lacks a prima facie case.

### F.   The District Court Erred by Referring to the Wrong Legal Standard for a Prima Facie Case.

Citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981), the district court stated that the prima facie burden "is not a heavy one" and that "ICP need only provide evidence that raises an inference of discrimination." USCA5 4754. But *Burdine* was a disparate-treatment case, which involved very different prima facie elements and did not require the identification of a neutral practice or causal link. 450 U.S. at 253. A disparate-impact plaintiff, however, must show "(1) a facially neutral policy; (2) that, in fact, has a disproportionately adverse effect on a protected class." *Pacheco*, 448 F.3d at 791 (Title VII). The district court erred in relying on inapplicable precedent. In doing so, it failed to identify what facially neutral rule Defendants were using and failed to find any causal connection between the rule and the alleged disparate impact. The

burden of proof, therefore, should never have shifted to Defendants. The Court should reverse the ruling in favor of ICP and render judgment for Defendants.

## IV.  DEFENDANTS MET THEIR BURDEN OF ESTABLISHING A LEGITIMATE INTEREST IN THEIR METHOD OF DISTRIBUTING TAX CREDITS.

If the Court concludes that ICP has established a prima facie case, it will then need to consider Defendants' legitimate interest in the rule or practice at issue. Because ICP's briefing focused on Defendants' approval of tax-credit projects, Defendants proved at trial that an objective scoring system that was open and transparent was decidedly in the government's, the developer's, and the low-income residents' interest. Such a showing should have shifted the burden back to ICP.

### A.  Defendants Needed to Prove Only a Legitimate and Substantial Interest.

The district court originally stated it would require Defendants to justify their conduct with a compelling governmental interest. USCA5 4762-65. After Defendants argued in their post-trial briefing that the standard should be lower—a legitimate governmental interest—the district court reconsidered its ruling, but ultimately did not reach the issue. USCA5 7069-70 n.17, 7075. The correct standard, used by almost all

courts of appeals and now confirmed by the HUD regulations, is a legitimate governmental interest.

Although this Court has never reached the question of what type of interest is required in a disparate-impact claim under the FHA, the majority of the courts of appeals have required a legitimate interest. *Gallagher*, 619 F.3d at 834 (requiring a "'manifest relationship' to a legitimate, non discriminatory policy objective"); *Graoch Assocs.*, 508 F.3d at 372 (requiring a "legitimate business reason"); *Reinhart v. Lincoln Cnty.*, 482 F.3d 1225, 1229 (10th Cir. 2007) (requiring a "genuine business need"); *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1195 (9th Cir. 2006) (requiring a "legitimate, bona fide governmental interest"); *Fair Hous. in Huntington Comm., Inc. v. Town of Huntington*, 316 F.3d 357, 366 (2d Cir. 2003) (requiring a "legitimate, bona fide governmental interest"); *Langlois*, 207 F.3d at 51 (requiring a "legitimate and substantial goal"); *Rizzo*, 564 F.2d at 149 (requiring a "legitimate, bona fide interest").

The new HUD regulations also refer to a "substantial, legitimate, nondiscriminatory interest[]." 24 C.F.R. § 100.500(b)(1)(i). And, again, the Supreme Court in the employment context required that the practice serve the "legitimate business goals" of the employer. *Wards Cove*, 490 U.S. at

661.[14]  Thus, Defendants should be required to prove only a legitimate governmental interest in order to shift the burden back to ICP.

## B.    Defendants Proved Their Practices Were Supported by a Legitimate Governmental Interest in an Open and Objective Scoring System.

As should be apparent, without the identification of the rule or practice that is causing the disparate impact, it is quite difficult to justify the rule or practice.    Because ICP's claim focused on Defendants' "approval" of units, Defendants demonstrated to the district court that the method it used—the scoring system under the QAP—was in the government's, developers', and public's best interest.

As testified to by multiple witnesses for Defendants, tax credits used to be given out in a more haphazard way, which led to unpredictability within the developer community and corruption within the Department. USCA5 5733, 6099-6100, 6179-82.    Following the Legislature's lead, the Department has since committed to an open and transparent method of allocating tax credits through the QAP.  USCA5 6087, 6100, 6178-79, 6183.

---

14. Congress altered that burden by amending Title VII to require the practice be consistent with "business necessity."  42 U.S.C. § 2000e-2(k).  But Congress did not similarly amend the FHA, so the *Wards Cove* analysis is still applicable.  *See Smith*, 544 U.S. at 240 (applying *Wards Cove* to claim under the ADEA because Congress did not amend the ADEA in the same way it amended Title VII).

To that end, Defendants develop a QAP with objective scoring elements, post lists of the applicants and their scores, and award credits to the top point earners.

As recognized by ICP's witnesses and Defendants' witnesses, developers want this objective system. USCA5 5583, 5698, 5734; Defs. Ex. 211, at 206 (ICP's president stating "the developers are scared to death of anything that smacks of discretion"). Developers know exactly where they stand in what can be an expensive application process. USCA5 5734. Defendants' methods also identify which applications have the best chance of long-term financial success and can remain a benefit to the low-income members of the community. USCA5 5898-99.

As history shows, the Board's use of discretion to trump the QAP scores can lead to harmful results. For example, when the Board used its discretion to deny credits to a developer who would have otherwise received them, that developer sued and obtained an injunction that prevented the Board from issuing any credits at all.[15] USCA5 6189-91. In

---

15. The developer in question was a former Board member who had received credits in each of the four previous years. USCA5 6189-90. The Board declined to issue him credits to avoid concerns about corruption and to spread the awards among different developers. USCA5 6190. This suggestion was met with applause by those members of the public attending the meeting. ICP Ex. 484, at 73.

order to allow the allocation of credits to other developers to move forward, the Board agreed to give the developer a forward commitment and the suit was dismissed.  USCA5 6191.

ICP did not challenge the reasoning behind the use of an objective QAP scoring system, instead denying that such arguments were relevant to its claim.  USCA5 6629-33.  It appears that ICP wanted Defendants to justify the racial distribution of the tax-credit units, but again, because Defendants did not intentionally distribute the credits on the basis of race, Defendants can defend only the method they actually did use to distribute the credits.  ICP, therefore, cannot argue that Defendants' legitimate interest is irrelevant to the lawsuit.  Defendants satisfied their burden, and it is up to ICP to demonstrate that there were no less discriminatory ways to meet the governmental interest.

## V.    ICP DID NOT PROVE THAT THERE WERE LESS DISCRIMINATORY ALTERNATIVES THAT WOULD MEET DEFENDANTS' INTERESTS.

For the reasons explained above, the district court erred in requiring Defendants to prove that there were no less discriminatory alternatives to achieve their legitimate interests.  Instead, the burden should have been on ICP to prove that there were ways Defendants could have achieved their interests while eliminating any racial disparity in the tax-credit units

being created.  24 C.F.R. § 100.500(c)(3).  ICP failed to meet that burden.

Aside from the misplaced burden of proof, the district court also erred by

relying on arguments that ICP explicitly chose not to make and failing to

back up its findings with any evidence from trial.

### A.    The District Court's Suggestions Open Defendants to Further Litigation and Do Not Satisfy Their Interests in Objectively Awarding Tax Credits.

The district court suggested that Defendants should have used their

"discretion" (with respect to forward commitments and 4% credits) to

achieve a different racial distribution of units.  USCA5 7082-85; *see also*

USCA5 6652-55 (ICP's request for race-conscious relief).  But the court did

not explain how Defendants could use their discretion to achieve a racial

balance without actually basing their decisions on race while meeting the

government's legitimate goals of openness and transparency in the

application process.[16]

Using "discretion" to achieve a racial balance poses significant

constitutional problems for Defendants.  In *Ricci*, the Supreme Court

considered whether Title VII was violated when a city threw out the

results of a firefighter exam because it produced a racially unbalanced

---

16. Moreover, because the Governor has eliminated forward commitments, those are no longer an "alternative."

result. 557 U.S. at 562-63. The Court held that the city's actions would violate Title VII, "absent a strong basis in evidence that the test was deficient and that discarding the results is necessary to avoid violating the disparate-impact provision [of Title VII]." *Id.* at 584. The Court left open the question of whether a "strong basis in evidence" would be sufficient to justify race-based acts under the Equal Protection Clause. *Id.*

There is no strong basis in evidence to support a disparate-impact claim here, so it cannot be a violation of the FHA for Defendants to refuse to take race-based acts such as granting forward commitments or rejecting 4% applicants based on the racial demographics of their neighborhoods. Moreover, just as the firefighters in *Ricci* had expended time and energy to prepare for the exam, the developers who seek credits spend time and a large mount of money to apply. Defs. Ex. 223, at 7. To ask Defendants to deny them credits because the proposed project is in neighborhood comprised of minority residents is unfair to the developers and invites future litigation. *Ricci*, 557 U.S. at 585 ("[O]nce that process has been established and employers have made clear their selection criteria, they may not then invalidate the test results, thus upsetting an employee's legitimate expectation not to be judged on the basis of race.").

This Court has also considered race-based solutions intended to resolve prior acts of discrimination. *Walker*, 169 F.3d 973. The Court in that case struck down a remedial order that required the explicit consideration of race when making housing decisions because it did not survive strict scrutiny under the Equal Protection Clause as there were race-neutral solutions that had not been attempted. *Id.* at 981-88. Here, Defendants should not be faulted for failing to use race-based remedies, given that all race-neutral remedies have not been exhausted.

The use of this type of discretion also does not serve Defendants' interests in choosing solid tax-credit projects in an open and objective manner. The QAP is designed to identify projects with the best chances of success while complying with federal and state law. Ignoring the QAP risks approval of projects that could fail, which helps no one, and moves the Department away from its goal of transparency. For example, one of the projects which ICP believes was wrongly denied credits was the lowest scoring non-elderly project in Region 3. USCA5 5884-88. Defendants should be allowed to decide whether they want to support a well done project in a minority community or a poorly conceived project in a Caucasian area.

Simply asserting Defendants could have used their discretion to achieve a racially balanced distribution of tax-credit units is insufficient when a host of legal and practical problems would have arisen. ICP must offer evidence that the use of discretion to achieve a racial balance can be accomplished while still meeting the legitimate and substantial goals of openness and transparency and avoiding a violation of the Equal Protection Clause.

## B.  The District Court's Challenges to Specific QAP Elements Were Not Made by ICP or Supported with Evidence.

The district court also took issue with some of the specific elements of the QAP, suggesting that Defendants could have changed some of the point awards. USCA5 7077-80. But ICP did not challenge the QAP's award of points, and there is no evidence that the district court's suggested changes would have resulted in a different racial distribution of units.

As noted earlier, ICP made very clear in its post-trial briefing that it was not challenging the 9% scoring system. USCA5 6629-33. The only specific complaint it made regarding the QAP was that Defendants removed "affirmatively furthering fair housing" as a non-scoring element that it could consider when awarding credits. USCA5 6371-74, 6667; ICP

Ex. 521. The district court should not have faulted the QAP sua sponte, without giving Defendants an opportunity to respond and explain their interests in and reasoning behind the QAP point elements.

The district court also did not cite evidence that its suggested alterations would have changed the disparate impact about which ICP complains. Moreover, focusing on individual QAP elements overlooks the bigger picture. The existence of a QAP element that, standing alone, may favor a minority neighborhood does not violate the FHA, because those points may be balanced out by other QAP points that favor Caucasian neighborhoods. The Court must consider the effect the elements have on the QAP as a whole. *Greater New Orleans*, 639 F.3d at 1086 (noting that in complex housing formulas there will likely be elements that favor one race over another). ICP provided none of that evidence or statistical analysis, and the district court cited none.

In sum, the district court wrongly placed the burden of proof on Defendants to show there were no less discriminatory alternatives. Although Defendants assert they met that burden, it should not have been theirs to bear. The evidence at trial does not permit any court to conclude that ICP demonstrated a way to achieve a racially balanced distribution

of units while retaining the open and transparent system needed by Defendants and developers. The Court should reverse the judgment for ICP on the disparate-impact claim and render judgment for Defendants.

## VI. THE DISTRICT COURT ERRONEOUSLY REQUIRED DEFENDANTS TO ACHIEVE A RACIALLY BALANCED DISTRIBUTION OF TAX CREDITS.

Finally, the remedy ordered by the district court is erroneous and serves to illustrate the problems with the liability ruling and the harm that such an error can cause. Had ICP or the district court identified the specific practice used by Defendants that was causing the disparate impact, the remedy would have been simple—enjoin the practice. Instead, Defendants have been tasked with achieving a race-conscious result (elimination of any disparate impact) using race-neutral methods. USCA5 7088, 7109-32.

### A. The District Court's Remedial Plan May Result in Future Litigation Under the Equal Protection Clause.

The district court ordered Defendants to propose a remedial plan that would "bring its allocation decisions into compliance with the FHA." USCA5 7088. Because the disparate-impact practice identified by the district court was the "disproportionate approval" of tax-credit units, USCA5 7086, as demonstrated by the statistical anomalies, Defendants'

only option is to create a system that encourages a different racial distribution of units. Thus, instead of using the race-neutral methods of the past, Defendants must consider the racial impact of each step they take in order to achieve a statistical result that the district court finds acceptable. This cannot be what Congress intended in the FHA, and it runs headlong into the Equal Protection Clause's prohibition on race-based decisions.

As Justice Scalia has warned, "Title VII's disparate-impact provisions place a racial thumb on the scales, often requiring employers to evaluate the racial outcomes of their policies, and to make decisions based on (because of) those racial outcomes." *Ricci*, 557 U.S. at 594 (Scalia, J., concurring); *see id.* at 595-96 (expressing concern that interpreting disparate-impact claims too broadly will lead to conflict with the Equal Protection Clause). And a plurality of the Court in *Watson* has previously cautioned:

> If quotas and preferential treatment become the only cost-effective means of avoiding expensive litigation and potentially catastrophic liability, such measures will be widely adopted. The prudent employer will be careful to ensure that its programs are discussed in euphemistic terms, but will be equally careful to ensure that the quotas are met. Allowing the evolution of disparate impact analysis to lead to this result

> would be contrary to Congress' clearly expressed intent, and it
> should not be the effect of our decision today.

487 U.S. at 993; *see also Ricci*, 557 U.S. at 581-82.  But under the district

court's order, Defendants must now seek some sort of racial balance in the

creation of a remedial plan.

Because the federal and state laws governing Defendants and the

QAP were not at issue, Defendants now bear the responsibility of

eliminating any disparate impact caused by those laws.  But those laws

may well comply with the FHA if they support a legitimate governmental

interest.  Implementation of the Fair Housing Act's Discriminatory Effects

Standard, 78 Fed. Reg. 11,477 (noting that "a practice may be lawful even

if it has a discriminatory effect").  Indeed, the district court's order

assumes that any racial disparity is illegal, even though there could be a

legitimate interest in various practices that cause a disparity, such as the

congressionally mandated preference for projects in QCTs.  26 U.S.C.

§ 42(m)(1)(B)(ii).

And, although ICP did not challenge Defendants' compliance with the

federal preference for projects in QCTs with community revitalization

plans, *id.*, the district court rejected Defendants' attempts to do so in the

remedial plan.  USCA5 7544-45.  Instead, the court suggested that

65

Defendants' method of expressing its preference (additional points) should be replaced with a two-step process of the court's own creation in which tax-credit projects are "selected" and then QCT projects are somehow "preferred" when it comes to allocating tax credits. USCA5 7533-38. Such a rule is unworkable, however, as each project must be allocated the amount of credits necessary for it to be financially feasible. Congress has prohibited the States from granting more credits than needed to be financially feasible, 26 U.S.C. § 42(m)(2)(a), and the desire for financially stable projects prevents the States from granting less than what is needed. The States must, therefore, express the preference for QCTs by awarding them more points to enable them to be chosen for an allocation in the first place, not by altering the amount of credits they will receive. The district court's rejection of Defendants' proposal ignores congressional intent to revitalize QCTs and threatens to push the racial balance too far in the other direction.

The mandate to achieve a racial balance also opens up Defendants to future litigation from individuals, such as Frazier, who want a different distribution of credits than ICP. Take the district court's order that creates a tiebreaker based on whether the project is in an HOA. USCA5

7883.  It is not difficult to imagine a suit filed by a developer on the losing side of that tiebreaker, claiming the use of "HOA" was simply a proxy for race.  While Defendants would vigorously defend any such lawsuit, the existence of a court order alone is no guarantee that Defendants would not be held liable.  *Walker*, 169 F.3d 981-88.

## B.    There Is No Evidence That the Remedial Plan Will Redress ICP's Complaint.

There is also little evidence that the remedial plan enacted by the district court will resolve ICP's complaint.  Because ICP chose not to introduce evidence about specific clients and where they would like to live, there is no guarantee that the remedial plan will produce properties in the correct locations, even if they are in low-minority neighborhoods.[17]  In fact, the evidence showed that three tax-credit properties in predominantly Caucasian areas within the City of Dallas had significant vacancy rates. USCA5 6594-95.  And ICP stated in its complaint that tax-credit projects in 90-100% Caucasian census tracts have only a 9% minority occupancy rate.  USCA5 45.  If that statistic holds, the creation of tax-credit

---

17.  ICP's failure to identify link any extra payments on behalf of client to an application for tax credits that was wrongly rejected by Defendants may also constitute a failure of proof when it comes to ICP's standing.  *See Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 497 (5th Cir. 2007) (en banc).

properties in Caucasian census tracts will actually reduce housing used by minorities.

As admitted by ICP's expert, the existence of tax-credit properties in high opportunity areas is not enough to ensure that minorities will actually live in those properties.  USCA5 5588-89, 5598-99.  If ICP's clients do not wish to live in the new tax-credit properties, ICP's claims in this trial will not be redressed.

## CONCLUSION

For the foregoing reasons, Defendants ask the Court to reverse the judgment of the district court and render judgment for Defendants.

Respectfully submitted.

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

JONATHAN F. MITCHELL
Solicitor General

  /s/ Beth Klusmann
BETH KLUSMANN
Assistant Solicitor General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
[Tel.] (512) 936-1914
[Fax] (512) 474-2697
*Beth.Klusmann@texasattorneygeneral.gov*

COUNSEL FOR APPELLANTS

## CERTIFICATE OF SERVICE

I certify that a copy of this brief was served via CM/ECF on April 22, 2013, to the following counsel:

Michael M. Daniel
Laura Beth Beshara
DANIEL & BESHARA
3301 Elm St.
Dallas, TX 75226

*Counsel for Appellee*

Brent M. Rosenthal
LAW OFFICE OF BRENT M.
  ROSENTHAL, PC
One Lincoln Center
5400 LBJ Freeway, Suite 1260
Dallas, TX 75240

*Counsel for Intervenor*

Counsel also certifies that on April 22, 2013, the foregoing instrument was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/.

Counsel further certifies that 1) required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; 2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and 3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

 */s/ Beth Klusmann*
Beth Klusmann
Assistant Solicitor General

## CERTIFICATE OF COMPLIANCE

With Type-Volume Limitation, Typeface Requirements,
and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[ X ]    this brief contains 13,726 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[  ]    this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ]    this brief has been prepared in a proportionally spaced typeface using WordPerfect, version 12 in Century Schoolbook Font 14-point type face, or

[  ]    this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

*/s/ Beth Klusmann*
Beth Klusmann

COUNSEL FOR APPELLANTS

Dated: April 22, 2013